# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched or identify the person by name and address)*  )
Red iPhone with a rainbow case  )
Seized as FP&F No. 2024565500027303  )
("Target Device 1")  )

Case No. **24-mj-03724**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-1, incorporated herein by reference

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 USC 1324 | Alien Smuggling |

The application is based on these facts:
See attached Affidavit of United States Border Patrol Agent Jase L. Ordonez-Nunez, incorporated herein by reference

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Jase Nunez*
*Applicant's signature*

Agent Jase L. Ordonez-Nunez, US Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____ *(specify reliable electronic means)*.

Date: September 30, 2024

*/s/ Judge signature*
*Judge's signature*

City and state: San Diego, California

Hon. Steve B. Chu, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

PROPERTY TO BE SEARCHED

The following property is to be searched:

>Red iPhone with a rainbow case
>Seized as FP&F No. **2024565500027303**
>(**"Target Device 1"**)

**Target Device 1** was seized from Guillermo Alvarez Velazco, and is currently in the possession of the Department of Homeland Security, Campo Border Patrol Sector Office, located at 311 Athey Ave, San Ysidro, Ca 92173.

# ATTACHMENT B
ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular/mobile devices shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile device will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of July 1, 2024, up to and including July 30, 2024:

a. tending to reflect planning of and/or involvement in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and/or phone numbers–that may contain electronic evidence tending to indicate efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in efforts to bring illegal aliens into the United States from Mexico and transport them within the United States;

d. tending to identify travel to or presence at locations involved in efforts to smuggle illegal aliens into and through the United States;

e. tending to identify the user of, or persons with control over or access to, the **Target Device**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of the transportation of illegal aliens in violation of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Agent Jase L. Ordonez-Nunez, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices (collectively, the **"Target Devices"**):

> Red iPhone with a rainbow case
> Seized as FP&F No. **2024565500027303**
> **("Target Device 1")**

> Red iPhone with a black case
> Seized as FP&F No. **2024565500027304**
> **("Target Device 2")**

as further described in Attachments A-1 and A-2 and incorporated herein by reference, and to seize evidence of a crime, specifically violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant relates to the investigation and prosecution of Timothy LOSSNER ("LOSSNER") and Stephen Jeffrey SMITH ("SMITH") (collectively, "Defendants") for transportation of illegal aliens Guillermo ALVAREZ Velazco ("ALVAREZ") and David VILLANUEVA Leon ("VILLANUEVA") (collectively, the "Material Witnesses") in violation of Title 8, United States Code, Section 1324, within the Southern District of California. The **Target Devices** were seized from ALVAREZ and VILLANUEVA on or about July 30, 2024, incident to the arrest of the Defendants and Material Witnesses. The **Target Devices** are currently in the custody of the Department of Homeland Security, Campo Border Patrol Sector Office, and located at 311 Athey Ave, San Ysidro, Ca 92173. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not

set forth every fact that I, or others, have learned during the course of this investigation. The information contained in this Affidavit is based upon my personal observations and knowledge, my review of various official reports, and upon conversations with other Border Patrol Agents. Dates and times are approximate.

## BACKGROUND

4.  I am a United States Border Patrol Agent with the Department of Homeland Security, Customs and Border Protection, United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal Border Patrol Agent ("BPA") with the USBP since 2019. I am currently assigned to the Campo Station's Abatement Team. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5.  My current duties involve conducting mobile and static surveillance and in unmarked vehicles, processing of criminal and administrative cases, complete seizure files and the electronic submission, conduct material witness and post Miranda statements, complete evidence files for criminal cases, complete and execute warrants, conduct vehicle stops in marked vehicles, and conduct records checks through law enforcement databases.

6.  During my tenure as a Border Patrol Agent, I have been called upon as a material witness on behalf of the United States Government to testify in a court trial. I have conducted investigations on numerous cases that involved illegal alien smuggling and the transportation in furtherance into the United States. These investigations yielded arrest and search warrants that led to indictment of the involved persons of the offense committed.

7.      Along with my training and experience, I have worked with other law enforcement agencies that helped me gain more information on the operational trends and tactics of illegal alien organizers and smugglers in the attempt to transport and further illegal aliens into the United States from. In my experience, I have learned that it is a common practice for alien smugglers to operate with other individuals or partners by utilizing cellular devices to maintain communications with co-conspirators and/or illegal aliens to further their criminal activities. With the smugglers and the smuggled illegal aliens being in constant movement, the use of the cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8.      The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens.  For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States.  These communications may also include locations for delivery to stash houses and/or sponsors.  Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing.  It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also

common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

   a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

   b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

   c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling and transportation of smuggled aliens;

   d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

  e. tending to identify the user of, or persons with control over or access to, the **Target Device(s)**; and/or

  f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On July 30, 2024, BPA F. Gamez was conducting his assigned duties within the Campo Border Patrol Station's area of responsibility. Agent Gamez was dressed in plain clothes with a green ballistic vest bearing Border Patrol patches and insignia, clearly displaying his status as a law enforcement officer. Agent Gamez was operating in an unmarked Border Patrol vehicle, equipped with functional emergency lights and siren.

12. At approximately 2:16 PM, while monitoring the Anduril Sentry Towers, BPA Z. Labedz advised, via service radio, of three individuals entering a silver minivan near Emery Road. Emery Road is a dirt road that connects State Route 94 and Humphries Road and is usually only traversed by Border Patrol Agents and residents that live on the few properties that are in the area. Humphries Road is less than half a mile north of the United States/Mexico Border Fence.

13. Agent Gamez began to respond to the area. At approximately 2:20 PM, Agent Labedz provided Agent Gamez with a photo image of the minivan and individuals. Agent Gamez was then advised of a silver Chrysler Pacifica being observed travelling towards Potrero, California. Records checks of the Pacifica revealed that the vehicle was registered to a rental company and had no prior travel through surrounding Ports of Entry or Border Patrol Checkpoints. At approximately 2:45 PM, Agent Gamez arrived at the community of Potrero and began searching for the minivan. As Agent Gamez traveled north on Potrero Valley Road (PVR), he observed a silver Chrysler Pacifica travelling southbound on PVR. As the Pacifica passed his location, Agent Gamez noticed an older male driver, later identified as defendant, SMITH, looking around and driving slowly, appearing to be lost in the area. Agent Gamez then conducted record checks of the Pacifica which confirmed registration to a rental company. After receiving this information, Agent Gamez requested,

via service radio, that a marked Border Patrol vehicle, assist in conducting a vehicle stop of the Pacifica. BPA J. Medina responded and staged his marked Border Patrol vehicle in an area known to BPAs as "Lone Pine."

14. At approximately 2:57 PM, BPA Medina merged onto State Route 94 and advised that he would be attempting a vehicle stop on State Route 94, near an area known to BPAs as "Turd Farm." The Pacifica yielded without further incident. At approximately 3:00 PM, BPAs Gamez and Medina approached the Pacifica and identified themselves as BPAs. Agent Medina conducted an immigration inspection of SMITH and the passenger, later identified as defendant, LOSSNER. Defendants each stated they were United States citizens. Agent Gamez then asked SMITH to lower the back window. After SMITH hesitantly lowered the window, Agent Gamez observed an individual, later identified as material witness, VILLANUEVA, hiding under a blanket in the third-row seat. Agent Gamez instructed VILLANUEVA to uncover himself and observed his camouflaged clothing. Agent Gamez conducted an immigration inspection of VILLANUEVA to which VILLANUEVA admitted to being a citizen of Mexico without proper documentation to enter or remain in the United States legally.

15. At approximately 3:01 PM, Agent Gamez placed defendants and VILLANUEVA under arrest. While conducting a search of the Pacifica, Agent Gamez observed an individual, later identified as material witness, ALVAREZ, hiding in the trunk space. Agent Gamez conducted an immigration inspection of ALVAREZ, who admitted to being a citizen of Mexico without proper documentation to enter or remain in the United States legally. At approximately 3:01 PM, Agent Gamez placed ALVAREZ under arrest.

16. Both material witnesses stated they are citizens of Mexico without any immigration documents that would allow them to enter or remain in the United States legally. Both Material Witnesses stated that smuggling arrangements were made for them to be smuggled into the United States for a fee of $8,000 USD. The Material Witnesses stated that they crossed on July 30, 2024, and the smuggles set up a ladder for them to climb and jump over. VILLANUEVA stated that they were being phone guided.

ALVAREZ stated that they walked north to a place near the road where a vehicle was going to pick them up. VILLANUEVA stated that he was told to throw away the phone once they reached the pick-up location. ALVAREZ stated that once the vehicle arrived, one of the occupants yelled out the window "Go, Go!" ALVAREZ stated that after they got in the vehicle and drove off, he asked them for water, but they just ignored him.

17. In photographic lineups, VILLANUEVA was able to identify LOSSNER as the driver of the vehicle that picked them up. VILLANUEVA was also able to identify SMITH as the co-pilot of the vehicle that picked them up. ALVAREZ was able to identify SMITH as one of the persons in the vehicle that picked them up.

18. **Target Device 1** was found on the person of ALVAREZ during a search incident to his arrest. During his post-arrest interview, ALVAREZ claimed **Target Device 1** as his. **Target Device 2** was found on the person of VILLANUEVA during a search incident to his arrest. During his post-arrest interview, VILLANUEVA claimed **Target Device 2** as his. The **Target Devices** were seized as evidence.

19. Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the **Target Devices** to communicate with others to further engage in alien smuggling. Further, in my training and experience, individuals engaged in alien smuggling may be involved in the planning and coordination of an alien smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the illegal aliens.

20. I am aware that smuggling conspiracies require planning to successfully evade detection by law enforcement. In my professional training and experience, this may require

panning and coordination in the days and weeks prior to the event. Additionally, co-conspirators are often unaware of the subject's arrest and will continue to attempt to communicate with the subject after the arrest to determine their whereabouts. Given this, I respectfully request permission to search the **Target Devices** for data beginning on July 1, 2024, up to and including July 31, 2024.

## METHODOLOGY

21. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

22. Following the issuance of this warrant, I will collect the **Target Devices** and subject it to analysis. All forensic analysis of the data contained within the telephone and

its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

23. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

24. Law enforcement has previously attempted to obtain the evidence sought by this warrant through consent of the Material Witnesses but was unable to download and conduct a review of the **Target Devices** before the Material Witnesses revoked consent.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

## CONCLUSION

25. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of Defendants' violations of Title 8, United States Code, Section 1324. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A-1 and A-2, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Agent Jase L. Ordonez-Nunez
United States Border Patrol

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 30th day of September, 2024.

_____
Honorable Steve B. Chu
United States Magistrate Judge